# United States District Court

## EASTERN DISTRICT OF TEXAS
### SHERMAN DIVISION

SONYA E. BYERLY, INDEPENDENT   §
EXECUTOR OF THE ESTATE OF   §
GREGORY G. BYERLY, DECEASED   §   Civil Action No. 4:18-CV-00592
      *Plaintiff*,   §   Judge Mazzant
v.   §
  §
STANDARD INSURANCE COMPANY   §
      *Defendants*.   §
  §

## MEMORANDUM OPINION AND ORDER

Pending before the Court is Plaintiff's Motion for Partial Summary Judgment with Supporting Memorandum (Dkt. #37) and Defendant's Motion for Summary Judgment or, Alternatively, for Judgment under Rule 52 (Dkt. #38). Having considered the motions and the relevant pleadings, the Court finds that Plaintiff's Motion for Partial Summary Judgment with Supporting Memorandum (Dkt. #37) is **DENIED** and Defendant's Motion for Summary Judgment or, Alternatively, for Judgment under Rule 52 (Dkt. #38) is **GRANTED**.

## BACKGROUND

This is an action for insurance benefits under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001, *et seq*. Plaintiff Gregory G. Byerly ("Byerly") filed this action on August 18, 2018 alleging that Defendant Standard Insurance Company ("Standard Insurance") refused to provide benefits which Standard Insurance was contractually obligated to pay (Dkt. #1; Dkt. #14; Dkt. #37; Dkt. #38). Byerly is accordingly seeking to recover the accidental death and dismemberment ("AD&D") benefits, pursuant to 29 U.S.C. § 1132(a)(1)(B), that he claims he was due under his group life insurance policy: Policy No. 648852-A (the "Group

Policy").[1]  Byerly is also requesting pre-judgment interest or disgorgement of profits earned—pursuant to § 1132(a)(3)—and attorneys' fees and costs—pursuant to § 1132(g).  The facts leading to the present action are as follows.

In December of 2016, Byerly, a Texas resident and citizen, was employed by Fidelity National Information Services, Inc. ("FIS") (Dkt. #14; Dkt. #37; Dkt. #38).  FIS is a Delaware limited liability company with its principal place of business in Jacksonville, Florida, that, among other things, sells computer software to financial institutions (Dkt. #38).  Byerly was employed as a manager at FIS (Dkt. #14; Dkt. #37; Dkt. #38).  As part of his compensation package, Byerly was insured under the Group Policy that Standard Insurance issued to FIS (Dkt. #14; Dkt. #37; Dkt. #38).  Because the Group Policy was non-contributory, FIS paid all premiums to Standard Insurance (Dkt. #51).  The Group Policy included accidental death and dismemberment coverage (Dkt. #14; Dkt. #37; Dkt. #38).  Although AD&D benefits were included in the Group Policy, Byerly alleges that he elected to purchase additional AD&D coverage and thus personally paid additional premiums directly to Standard Insurance (Dkt. #51).[2]

On December 28, 2016, Byerly was allegedly involved in an accident which resulted in him sustaining an injury to his left foot; specifically, Byerly injured the second toe of his left foot (Dkt. #38, Exhibit 1 at pp. 821–33).  Following this injury, Byerly developed a bone infection in his left foot (Dkt. #38, Exhibit 1 at p. 800).  The infection eventually spread to his leg (Dkt. #38,

---

[1] Byerly passed away on February 22, 2019 (Dkt. #25).  Consequently, Byerly now seeks these Group Policy benefits through his wife, Sonya E. Byerly, who serves as Independent Executor of the Estate of Gregory G. Byerly.  Because the present action was filed by Gregory G. Byerly, this opinion will continue to discuss the merits of this case as though the claims were still being asserted by Mr. Byerly.

[2] This allegation, that Byerly purchased additional AD&D coverage and paid those premiums, rather than FIS, which the Court was first made aware of when Byerly provided the Court with the supplemental briefing the Court ordered for its choice-of-law analysis, was not accompanied by any exhibit offering proof of said payments.  Accordingly, the Court may not consider this statement as it is not proper summary judgment evidence.  *See Johnson v. City of Houston*, 14 F.3d 1056, 1060 (5th Cir. 1994) ("Unsworn pleadings, memoranda or the like are not, of course, competent summary judgment evidence.") (citation omitted).

Exhibit 1 at p. 188). As a result of said bone infection, Byerly was forced to undergo a below the

knee amputation ("BKA") (Dkt. #38, Exhibit 1 at p. 188). Byerly subsequently made a claim (the

"Claim") for AD&D benefits under the Group Policy (Dkt. #38, Exhibit 1 at pp. 821–35).

On June 26, 2018, Standard Insurance received Byerly's AD&D claim (Dkt. #38, Exhibit

1 at pp. 821–35). Upon receipt of the Claim, Standard Insurance began its investigation (Dkt. #38,

Exhibit 1 at p. 817). First, Standard Insurance began by collecting Byerly's medical records and

looking to Byerly's Claim. Accompanying Byerly's Claim was a letter from a cardiologist, Tony

M. Das, M.D., FACC ("Dr. Das"), which described the alleged accident and its aftermath. The

letter stated:

> Gregory Byerly is 67-year-old gentlemen with significant history of coronary artery
> disease, chronic kidney disease, and type 1 diabetes mellitus. In December 2016, he
> sustained an open wound to his left foot in a household accident. This occurred when he
> hit his foot against a piece of furniture. He was treated initially by a podiatrist and wound
> care doctor and referred for further treatment. This wound quickly became necrotic and
> ultimately as result he developed osteomyelitis, which spread to the lower leg. In spite of
> multiple vascular procedures to hopefully avoid and at least minimize amputation, it was
> necessary for him to undergo a below-the knee amputation on 04/03/17. This was
> performed by Dr. Matthew Pompeo.

(Dkt. #38, Exhibit 1 at pp. 821–33). Byerly additionally listed his treating physicians (Dkt. #38,

Exhibit 1 at pp. 834–35). As a result of Byerly's disclosures, Standard Insurance pursued medical

records from the listed treating physicians. The records revealed a history of medical ailments.

More specifically, Byerly's medical records detailed an extensive history of diabetes, peripheral

neuropathy, and peripheral arterial disease ("PAD") (Dkt. #38, Exhibit 1 at pp. 158–59). The

records also revealed that Byerly had been undergoing dialysis since approximately 2015 due to

poor renal function (Dkt. #38, Exhibit 1 at pp. 158–59). Further, the records revealed that, in 2015,

Byerly was diagnosed with moderate to severe distal polyneuropathy in his lower extremities

(Dkt. #38, Exhibit 1 at pp. 747–48). Byerly's medical records also outlined, in greater detail than

Dr. Das' summary, the treatment that Byerly sought relating to the December 28 injury. The line of events following Byerly's December 28 injury are as follows.

As Byerly's medical records indicate, Byerly first visited Dr. Douglas A. Fullington ("Dr. Fullington"), on December 31, 2016 (Dkt. #38, Exhibit 1 at pp. 701–02). Byerly complained of a three-day-old wound on the second toe of his left foot and stated that "that he stubbed his toe on the bedframe in his room" (Dkt. #38, Exhibit 1 at p. 701). Dr. Fullington, after examining Byerly, noted that Byerly had "diabetes with peripheral neuropathy and no feeling in his toes" (Dkt. #38, Exhibit 1 at p. 701). Dr. Fullington then diagnosed Byerly with a toe wound with secondary cellulitis and uncontrolled Type 1 diabetes mellitus with peripheral neuropathy (Dkt. #38, Exhibit 1 at p. 703). Notably, Dr. Fullingon stated that there "[did] not appear to be a deeper infection" of the wound (Dkt. #38, Exhibit 1 at p. 703). "Accordingly, Dr. Fullington instructed Byerly to treat the wound with antibiotics, discussed the risk of a worsening infection, and referred Byerly to a podiatrist for further care" (Dkt. #38) (citing Dkt. #38, Exhibit 1 at pp. 703–704).

On February 2, 2017, Byerly underwent magnetic resonance imaging ("MRI") of his left foot per standard protocol without contrast to evaluate for osteomyelitis (Dkt. #38, Exhibit 1 at p. 801). The MRI revealed "[s]econd digit distal soft tissue loss with adjacent osteomyelitis of the distal phalanx and early osteomyelitis of the middle phalanx" (Dkt. #38, Exhibit 1 at p. 801). Byerly then visited a podiatrist, Steven Miller, DPM ("Dr. Miller") on March 7, 2017 (Dkt. #38, Exhibit 1 at p. 799). Byerly's chief complaint to Dr. Miller was that he was suffering from continuing pain, swelling, and tenderness in the second toe of his left foot (Dkt. #38, Exhibit 1 at p. 799). Upon examination, Dr. Miller observed that Byerly's toe had "wet gangrene," a foul odor, and "ha[d] begun auto-amputation and ha[d] a demarcation line" (Dkt. #38, Exhibit 1 at p. 800). Dr. Miller additionally noted that the "bioburden [was] extreme and the infection seem[ed] to be

spreading" (Dkt. #38, Exhibit 1 at p. 800). The toe was accordingly excised at the proximal interphalangeal joint two days later (Dkt. #38, Exhibit 1 at pp. 797–98). Byerly was then placed in a post-operative shoe, weight bearing as tolerated, and instructed to return to the clinic for a follow-up with Dr. Miller one-week post-operation (Dkt. #38, Exhibit 1 at p. 798).

On March 15, 2017, at Byerly's follow-up appointment, Dr. Miller indicated that Byerly's formal diagnoses was "Gangrene of toe 2nd LEFT" (Dkt. #38, Exhibit 1 at p. 795). Dr. Miller also noted that the toe was "[p]rogressing as expected" (Dkt. #38, Exhibit 1 at p. 796). On March 28, 2017, at his next follow-up appointment with Dr. Miller, Byerly was diagnosed with a "[d]iabetic ulcer of foot associated with diabetes mellitus due to underlying condition, with necrosis of bone" (Dkt. #38, Exhibit 1 at pp. 793–794). This time, Dr. Miller noted that the toe exhibited "very slow improvement" (Dkt. #38, Exhibit 1 at p. 794). Accordingly, Byerly underwent a second MRI, without contrast, due to his renal function, which revealed a worsening infection and a "large irregular abscess containing gas centered around the second metatarsal extending proximally" (Dkt. #38, Exhibit 1 at p. 792). The MRI also gave the impression of "extensive osteomyelitis of the second and third metatarsal and third proximal phalanx" (Dkt. #38, Exhibit 1 at p. 792).

On April 3, 2017, after it was discovered that the infection spread from Byerly's foot to his leg, Dr. Matthew Q. Pompeo ("Dr. Pompeo") performed a left-leg below-the-knee amputation (Dkt. #38, Exhibit 1 at p. 188). Dr. Pompeo's notes described Byerly's recent medical history leading to the BKA as follows:

> Patient was recently admitted with a nonhealing left heel decubitus related to his neuropathy and peripheral arterial disease. He ended up having to have a left below-the-knee amputation done at Walnut Hill Medical Center on April 3, 2017.

(Dkt. #38, Exhibit 1 at p. 188). On April 25, 2017, at Byerly's post-BKA follow-up appointment, Dr. Pompeo documented that Byerly was "seen today for complications of diabetic neuropathy" (Dkt. #38, Exhibit 1 at p. 188). Dr. Pompeo also noted that his impression was that Byerly's

"[d]iabetic neuropathy put[] him at a high risk for limb loss, especially combined with his peripheral arterial disease" (Dkt. #38, Exhibit 1 at pp. 189–190). On May 23, 2017, after Byerly suffered from a fall that re-opened the BKA incision, Byerly was forced to undergo a re-closure of the BKA stump (Dkt. #38, Exhibit 1 at p. 226). Dr. Pompeo then continued to monitor Byerly's BKA stump as it healed (Dkt. #38, Exhibit 1 at pp. 247, 279–280, 312, 336).

After receiving said medical records, and thus a clearer, more detailed picture of the events leading to the BKA, Standard Insurance enlisted Christina N. Bergstrom, M.D. ("Dr. Bergstrom"), a Board-Certified Doctor in Family Medicine, to review the records (Dkt. #38, Exhibit 1 at pp. 158–66). Dr. Bergstrom's task was to determine "whether Byerly's BKA was directly caused by an accident and unrelated to his current medical condition" (Dkt. #38, Exhibit 1 at pp. 158–66). Her response is set out below:

> The initial toe wound was caused by an injury on 12/28/2016, however the development of infection and gangrene was related to his current medical conditions (diabetes, peripheral neuropathy, and PAD), and likely would not have occurred in the absence of those conditions. The nonhealing decubitus heel ulcers for which BKA was performed were reported to be due to diabetes, peripheral neuropathy, and PAD, without evidence of an accident as the inciting cause.
>
> The claimant had a fall that caused opening of the wound at the site of the prior left BKA requiring wou[n]d revision on 5/23/2017. However, the initial amputation was performed for nonhealing ulcerations due to diabetes, peripheral neuropathy and PAD as noted above. In my opinion, Mr. Byerly's amputation was not directly caused by an accident and was related to diabetes, peripheral neuropathy, and PAD.

(Dkt. #38, Exhibit 1 at p. 163).

As a result of Standard Insurance's investigation and Dr. Bergstrom's review of Byerly's medical records, Standard Insurance concluded that "it appear[ed] unlikely that [Byerly] stubbing [his] toe would have resulted in the amputation had [he] not had diabetes, peripheral neuropathy, and peripheral arterial disease" (Dkt. #38, Exhibit 1 at p. 146). Consequently, Standard Insurance sent Byerly a letter dated October 8, 2018, denying his Claim on the grounds that his Claim was

not payable under the Group Policy's express terms and exclusions (Dkt. #38, Exhibit 1 at p. 146). Standard Insurance indicated, however, that if Byerly had "further documentation from [his] physician showing that [his] Loss was not caused or contributed to by a sickness . . ." he could forward said information to Standard Insurance's office (Dkt. #38, Exhibit 1 at pp. 145–47).

Byerly appealed Standard Insurance's denial of his Claim on October 22, 2018 (Dkt. #38, Exhibit 1 at pp. 141–43). Byerly argued that he "had lived for years with diabetes and PAD, but it was not until the accident that the infection developed that caused the loss of his lower leg" (Dkt. #38, Exhibit 1 at pp. 141–43). As such, Byerly argued that his Claim should be approved (Dkt. #38, Exhibit 1 at pp. 141–43). Standard Insurance accordingly began the appeal process and requested additional medical record from Walnut Hill Medical Center (Dkt. #38, Exhibit 1 at pp. 134–135). The records never came. As a result, Standard Insurance limited its review to the Administrative Record before it and referred Byerly's file to a "medical professional who was not previously consulted in connection with [the] claim" for additional medical review (Dkt. #38, Exhibit 1 at pp. 110–11). This time, Bradley Fancher, M.D. ("Dr. Fancher"), a physician, Board Certified in Internal Medicine, conducted the review (Dkt. #38, Exhibit 1 at pp. 115–120). Like Dr. Bergstrom, Dr. Fancher was tasked with determining whether "the medical records support[ed] that Mr. Byerly had any sickness, illness, or disease that caused or contributed to his eventual left below the knee amputation" (Dkt. #38, Exhibit 1 at pp. 115–120). On November 20, 2018, Dr. Fancher completed his medical review. Dr. Fancher opined as follows:

> I have seen hundreds of patients with foot injuries. I have never encountered an otherwise health[y] patient who required an amputated leg, from a simple "stubbed toe," or from any other minor foot injury or laceration. The sequence of events that happened here however, is extraordinarily common, unfortunately, in diabetics with vascular disease.

> Dr. Miller notes in his records that the claimant's foot condition was a complication of a diabetic ulcer, resulting in necrosis of the bone.

The claimant did not require an amputation due to trauma alone. The claimant's course could have only happen[ed] if he had severe underlying vascular disease, which clearly was the case here. His vascular disease was the result of longstanding history of type 1 diabetes. The claimants elevated glucose levels likely impaired the effectiveness of his white blood cells. It is unlikely that the claimant ever had an adequate amount of antibiotic delivered to his infected wound because of his greatly diminished blood perfusion.

In my opinion, the claimant's nonhealing ulcer, with gangrene, and his need for amputation was directly related to his diabetes and to his severe peripheral vascular disease.

(Dkt. #38, Exhibit 1 at pp. 117–18).

Following Dr. Fancher's conclusion, Standard Insurance notified Byerly that it would be upholding its denial of Byerly's Claim (Dkt. #38, Exhibit 1 at p. 88–95). Byerly was notified by letter dated December 17, 2018 (Dkt. #38, Exhibit 1 at p. 88–95). Standard Insurance reiterated, after summarizing Byerly's medical records, that the Loss was "not caused solely and directly by an accident independently of other causes" (Dkt. #38, Exhibit 1 at pp. 88–95). Rather, Standard Insurance maintained that the loss was caused and contributed to by sickness—an explicit exception to AD&D benefits (Dkt. #38, Exhibit 1 at pp. 88–95). Consequently, Standard Insurance determined that Byerly was not entitled to AD&D benefits (Dkt. #38, Exhibit 1 at p. 88–95).

As previously stated, Byerly filed this action, after exhausting his administrative remedies, on August 18, 2018. On July 12, 2019, Byerly filed Plaintiff's Motion for Partial Summary Judgment with Supporting Memorandum (Dkt. #37). Standard Insurance filed Defendant's Motion for Summary Judgement, or, Alternatively, for Judgment under Rule 52, on the same day (Dkt. #38). Standard Insurance filed Defendant's Response to Plaintiff's Motion for Partial Summary Judgment on August 9, 2019 (Dkt. #43). Byerly then filed Plaintiff's Reply Brief to Defendant's Response to Motion for Partial Summary Judgment (Dkt. #44). On August 30, 2019, Standard Insurance filed Defendant's Sur-Reply to Plaintiff's Reply Brief to Defendant's Response to Motion for Partial Summary Judgment (Dkt. #45). Byerly then filed Plaintiff's

Response to Defendant's Motion for Summary Judgment (Dkt. #47) on September 30, 2019. No Reply supporting Defendant's Motion for Summary Judgment was filed.

After receiving the aforementioned briefing, and determining that said briefing was inadequate as to the choice of law issue presented to the Court, the Court ordered the parties to each submit a supplemental brief on which law governs the present matter. On March 4, 2020, Standard Insurance filed Defendant's Supplemental Brief on Governing Law (Dkt. #50). Byerly likewise filed his Supplemental Brief in Support of Plaintiff's Motion for Partial Summary Judgment (Dkt. #51) on March 4, 2020.

## LEGAL STANDARD

The purpose of summary judgment is to isolate and dispose of factually unsupported claims or defenses. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986). Summary judgment is proper under Rule 56(a) of the Federal Rules of Civil Procedure "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A dispute about a material fact is genuine when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248 (1986). Substantive law identifies which facts are material. *Id.* The trial court "must resolve all reasonable doubts in favor of the party opposing the motion for summary judgment." *Casey Enters., Inc. v. Am. Hardware Mut. Ins. Co.*, 655 F.2d 598, 602 (5th Cir. 1981).

The party seeking summary judgment bears the initial burden of informing the court of its motion and identifying "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" that demonstrate the absence of a genuine issue of material fact. FED. R. CIV. P. 56(c)(1)(A); *Celotex*, 477 U.S. at 323. If the movant bears the burden

9

of proof on a claim or defense for which it is moving for summary judgment, it must come forward with evidence that establishes "beyond peradventure *all* of the essential elements of the claim or defense." *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986). Where the nonmovant bears the burden of proof, the movant may discharge the burden by showing that there is an absence of evidence to support the nonmovant's case. *Celotex*, 477 U.S. at 325; *Byers v. Dall. Morning News, Inc.*, 209 F.3d 419, 424 (5th Cir. 2000). Once the movant has carried its burden, the nonmovant must "respond to the motion for summary judgment by setting forth particular facts indicating there is a genuine issue for trial." *Byers*, 209 F.3d at 424 (citing *Anderson*, 477 U.S. at 248–49). A nonmovant must present affirmative evidence to defeat a properly supported motion for summary judgment. *Anderson*, 477 U.S. at 257. Mere denials of material facts, unsworn allegations, or arguments and assertions in briefs or legal memoranda will not suffice to carry this burden. Rather, the Court requires "significant probative evidence" from the nonmovant to dismiss a request for summary judgment. *In re Mun. Bond Reporting Antitrust Litig.*, 672 F.2d 436, 440 (5th Cir. 1982) (quoting *Ferguson v. Nat'l Broad. Co.*, 584 F.2d 111, 114 (5th Cir. 1978)). The Court must consider all of the evidence but "refrain from making any credibility determinations or weighing the evidence." *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007).

## ANALYSIS

The Court is presented with cross-motions for summary judgment. Byerly contends that Standard Insurance erred in denying him AD&D benefits and accordingly requests that the Court grant Byerly's Motion and declare that he is entitled to the benefits he sought under the Group Policy. On the contrary, Standard Insurance maintains that it correctly interpreted the Group Policy, its factual determinations were accurate, and it accordingly was justified in concluding that

Byerly's BKA was caused or contributed to by sickness, rather than accident. As such, Standard Insurance not only opposes Byerly's Motion, but has also filed its own motion for summary judgment arguing that the Court should deny Byerly's claims under §§ 1132(a)(1)(B) and (a)(3).[3]

The Court's opinion proceeds as follows. First, the Court must ascertain what law governs this action. The Court's conclusion as to this issue will determine whether an anti-delegation statute is at play. Second, the Court will address the standard of review issue that is presented to the Court; namely, whether the Court is to apply the Eleventh or Fifth Circuit's standard of review to Standard Insurance's determination. After determining that the Court need not decide this question, the Court will then review the Administrative Record based on both the Eleventh and Fifth Circuit's standards of review to determine the overarching question: whether Byerly is entitled to AD&D benefits. The Court concludes that Byerly is not entitled to said benefits or a disgorgement of pre-judgment interest or profits.

I.      Choice of Law: Texas or Florida

Before the Court can turn to the Administrate Record, the Court must first ascertain what law applies to the present dispute. The Group Policy contains no choice of law clause which has left a void that the Court must fill. Each party proffers a different state's law to fill this void: Standard Insurance argues that Florida law governs whereas Byerly argues that Texas law governs. At the outset, the Court notes that neither Standard Insurance nor Byerly adequately briefed the Court on the choice of law issue. Indeed, even after the Court ordered that each party supplement their briefing on this critical threshold issue, the parties failed to properly discuss the relevant choice of law principles that the Court must consider in determining whether Texas or Florida law applies. Rather, each party summarily proffered that one state's laws applied, cited a handful of

_____

[3] The Court finds that Rule 56 is the proper vehicle for the present dispute.

facts, and provided minimal legal analysis. The Court, consequently, must consider what law governs this case with little aid from the parties.

Texas and Florida law are in conflict. Texas, pursuant to § 1701.062(a) of the Texas Insurance Code, has prohibited delegation clauses in insurance policies.[4] As a result of such prohibition, a *de novo* review of the Administrative Record is, at first glance, required. With that being said, an open question in the Fifth Circuit is inherently implicated by the Texas Insurance Code's anti-delegation statute; namely, whether ERISA preempts § 1701.062(a). On the other hand, there is no anti-delegation statute enacted in Florida. As such, an abuse of discretion standard of review is required should Florida law govern. As evidenced, there is an inherent conflict between Texas and Florida law. Moreover, the application of Texas law would require the Court to consider whether ERISA preempts a state statute—an endeavor not required by Florida law. While this preemption issue does not factor into the Court's analysis when contemplating which state's law applies, it nonetheless demonstrates the conflict between the two state's laws and how an application of one over the other might result in a different outcome. Thus, the Court must ascertain whether Texas or Florida law governs. *See U.S. v. 2004 Ferrari 360 Modeno*, 902 F. Supp. 2d 944, 952 (S.D. Tex. 2012) (citing *DK Joint Venture 1 v. Weyand*, 649 F.3d 310, 314 (5th Cir. 2011) ("[W]here there is no conflict between the laws of the two forums, then the Court need not determine which law governs.")). Before the Court can turn to its choice of law analysis, however, the Court must first address the caselaw that each party claims governs this decision.

---

[4] "Discretionary clause" and "delegation clause" are used interchangeably throughout this opinion.

A. Inapplicable Precedent

Standard Insurance avers that Florida law governs this case. In support of its argument, Standard Insurance cites *Rittinger v. Healthy All. Life Ins. Co.*, 914 F.3d 952 (5th Cir. 2019). *Rittinger* concerned the beneficiary of a health plan, Karen A. Rittinger, who filed suit after the plan administrator, Anthem, denied coverage of her bariatric surgery and post-operation complications. *Id.* at 954–55. The district court, after noting that neither party contested the validity of the plan's delegation clause, reviewed Anthem's denial of benefits for abuse of discretion. *Id.* at 955. The district court found no abuse of discretion as to Rittinger's first-level appeal, but found abuse of discretion as to Rittinger's second-level appeal. *Id.* On appeal to the Fifth Circuit, Rittinger argued that *Ariana M. v. Humana Health Plan of Tex., Inc.*, 884 F.3d 246 (5th Cir. 2018) (en banc) required the Fifth Circuit to review Anthem's denial *de novo*. *Id.* The Fifth Circuit rejected such argument. *Id.* First, the Fifth Circuit noted that Rittinger "never challenged the [delegation] clause's enforceability in the district court." *Id.* Thus, the Fifth Circuit held that Rittinger forfeited any argument that Anthem's fiduciary discretion was invalid. *Id.* The Fifth Circuit consequently held that Rittinger's invocation of *Ariana M.* was of no consequence as "*Ariana M.* only governs cases in which a plan does not validly delegate fiduciary discretion." *Id.* (footnote omitted). Because Rittinger had waived any argument that the delegation clause was unenforceable, and thus that Anthem's fiduciary discretion was not validly delegated, the Fifth Circuit held that *Ariana M.* had no import. *Id.*

Even if Rittinger had not waived her challenge of the delegation clause's enforceability, the Fifth Circuit noted that Texas law did not apply. *Id.* The Fifth Circuit stated that, "even though Texas Insurance Code § 1701.062 ban insurers' use of delegation clauses in Texas, Missouri law governs this case." *Id.* Missouri law applied, the Fifth Circuit continued, because *Rittinger*

involved "a plan sold in Missouri by a Missouri insurer to a Missouri employer. Moreover, the Certificate of Coverage specifically states that the "laws of the state in which the Group Contract was issued [Missouri] will apply." *Ariana M.*, therefore, does not control." *Id. Rittinger* does not control this case.

Standard Insurance avers that:

Like in *Rittinger*, this case involves a Group Policy sold in Florida by an Oregon insurer to a Florida employer. Moreover, the Group Policy specifically states that it was issued in Florida, and all decisions made regarding the Group Policy were made outside of Texas. Accordingly, Florida law governs this case, and Texas Insurance Code § 1701.062 does not control.

(Dkt. #43) (internal citations omitted). While there may be some factual similarities between *Rittinger* and the present action, *Rittinger* is distinguishable and does not apply. In *Rittinger*, the Appellee, Karen Rittinger, waived any argument that the Anthem's discretionary clause was invalid. As a result, the Fifth Circuit assumed that Missouri law governed based on a summary review of the facts and, most importantly, the recognition of a choice of law clause. The Fifth Circuit's statement cannot be construed as a choice of law analysis because that is not what the Fifth Circuit was attempting to do. Rather, it was noting that Rittinger waived an issue for appeal and demonstrating how waiver of that issue meant that *Ariana M.* did not control. That the Court noted three facts and the existence of a choice of law clause as evidencing that Missouri law applied is not enough to support Standard Insurance's claim that Florida law must consequentially apply. Here, the facts are much more varied, there is no choice of law clause, and issues concerning the Group Policy's discretionary clause and what law governs this case are squarely before the Court. Moreover, the Fifth Circuit's short discussion cannot be deemed a choice of law analysis

as it does not consider any of the Restatement's choice of law principles.[5]  Thus, *Rittinger* does

not control this case.[6]

While Standard Insurance relies on one case for its choice of law analysis, Byerly likewise

relies upon on a single case: *Pike v. Hartford Life & Accident Ins. Co.*, 368 F. Supp. 3d 1018 (E.D.

Tex. 2019).  Specifically, Byerly relies on footnote 2 of the Court's decision in *Pike*.  Footnote 2

stated:

> In *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S. Ct. 948, 103 L.Ed.2d
> 80 (1989), the Supreme Court held that "denial of benefits challenged under [29 U.S.C.]
> § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives
> the administrator or fiduciary discretionary authority to determine eligibility for benefits
> or to construe the terms of the plan."  "That means the default is that the administrator has
> no discretion, and the administrator has to show that the plan gives it discretionary authority
> in order to get any judicial deference to its decision."  *Kearney v. Standard Ins. Co.*, 175
> F.3d 1084, 1089 (9th Cir. 1999), *cert. denied*, 528 U.S. 964, 120 S. Ct. 398, 145 L.Ed.2d
> 310 (1999).
>
> "Although *Firestone* established a *de novo* default, the exception quickly swallowed the
> rule: simply by inserting an unambiguous discretionary clause into a plan document, the
> administrator could ensure that a reviewing court would employ a highly deferential abuse-
> of-discretion or arbitrary-and-capricious standard in evaluating a denial of benefits."
> *Weisner v. Liberty Life Assurance Company of Boston*, 192 F.Supp.3d 601, 609 (D. Md.
> 2016).  State legislatures and insurance regulators have in the recent past enacted statutes,
> regulations, and administrative rules that either prohibit outright the use of discretionary
> clauses in insurance contracts or impose limitations on the content and format of these
> clauses. *Id.* (citing *Davis v. Unum Life Ins. Co. of Am.*, No. 4:14-cv-00640-KGB, 2016
> WL 1118258, at *3 (E.D. Ark. Mar. 22, 2016) (noting that, as of 2015, nearly half of the
> states had implemented or were in the process of implementing such restrictions)).  Texas
> is among those states and recently enacted a law banning insurers' use of delegation
> clauses. *See* TEX. INS. CODE § 1701.062(a).

*Id.* at 1024 n.2.  Byerly avers that *Pike* is conclusive proof that the Texas Insurance Code applies

in this case and mandates a *de novo* review of the record.  Byerly is mistaken.  While *Pike*

---

[5] Those principles and their applicability will be discussed in greater detail below.

[6] Standard Insurance cites *Burrell v. Metro. Life. Ins. Co.*, 2020 WL 532934, at *6 (W.D. Tex. Feb. 3, 2020) as
additional support for the proposition that *Rittinger* controls in this case.  Again, Standard Insurance is mistaken.
*Burrell* concerned a residual choice of law analysis and discussed *Jimenez v. Sun Life Assur. Co. of Can.*, 486 F. App'x
398 (5th Cir. 2012) for how to determine whether to enforce a choice of law clause in an ERISA plan when a party
argued that the clause should not be enforced.  Notably, there was a valid choice of law clause in the *Burrell* Plan;
there is not here.  Thus, *Burrell* presents a different fact pattern, with a different burden on the plaintiff, which does
not persuade the Court that it may forgo a formal choice of law analysis here.

recognized the applicability of the Texas Insurance Code in cases governed by Texas law, the Court's holding does not mandate the application of the Texas Insurance Code here simply because Byerly was a Texas resident and citizen. The Court's holding simply means that the Insurance Code applies *when Texas law governs*, it does not mean that Texas law *must* govern. Moreover, the Court conducted a *de novo* standard of review in *Pike*—without wading into the waters of ERISA preemption—because the parties stipulated that *de novo* review applied in that case. *Id.* at 1024. There is no stipulation here and the law that governs this case is uncertain. Byerly's reliance on *Pike* is accordingly misplaced.

Finding that neither party provided any legal authority that could guide the Court, the Court now turns to determining what law governs this action on its own.

### B. Choice of Law Analysis

When jurisdiction is predicated upon the diversity of the parties before the court, "[a] federal court is required to follow the choice of law rules of the state in which it sits." *Resolution Tr. Corp. v. Northpark Joint Venture*, 958 F.2d 1313, 1318 (5th Cir. 1992) (citing *Klaxon v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941)). Conversely, the Fifth Circuit has held that district courts, when exercising federal question subject matter jurisdiction, should apply "federal common law choice-of-law principles" to ascertain which substantive law will apply. *Singletary v. United Parcel Serv., Inc.*, 828 F.3d 342, 351 (5th Cir. 2016) (citing *Jimenez v. Sun Life Assur. Co. of Canada*, 486 F. App'x 398, 406–07 (5th Cir. 2012) ("We have not previously addressed how we should decide residual choice of law disputes in the ERISA context. However, we have held that we should apply federal common law choice of law principles when we exercise federal question jurisdiction over a case.")); *Great Lakes Reinsurance (UK) PLC v. Durham Auctions, Inc.*, 585 F.3d 236, 241–42 (5th Cir. 2009); *Haynsworth v. The Corporation*, 121 F.3d 956, 962 (5th Cir.

1997); *see also Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 56 (1987) ("The expectations that a federal common law of rights and obligations under ERISA-regulated plans would develop, indeed, the entire comparison of ERISA's § 502(a) to § 301 of the LMRA, would make little sense if the remedies available to ERISA participants and beneficiaries under § 502(a) could be supplemented or supplanted by varying state laws."). Accordingly, the Court applies federal common law choice of law principles to decide whether Texas or Florida law governs the Group Policy to the extent that either state's law is not preempted by ERISA. *See DaimlerChrysler Corp. Healthcare Benefits Plan v. Durden*, 448 F.3d 918, 922 (6th Cir. 2006) ("In determining which state's law applies in an ERISA case, this court's 'analysis is governed by the choice of law principles derived from federal common law.'") (citation omitted)). "'Federal common law follows the approach of the RESTATEMENT (SECOND) OF CONFLICTS OF LAWS.'"[7] *SPBS, Inc. v. Mobley*, 2018 WL 4185522, at *11 (E.D. Tex. Aug. 31, 2018) (citing *Yesh v. Lakewood Church*, 2012 WL 5244187, at *3 (S.D. Tex. Feb. 14, 2012) (quoting *Nat'l Fair Housing Alliance, Inc. v. Prudential Ins. Co. of Am.*, 208 F. Supp. 2d 46, 62 (D.D.C. 2002)); *see also Jimenez*, 486 F. App'x at 406–07 (discussing the Fifth Circuit's reliance on the Restatement in *Albany Ins. Co. v. Anh Thi Kieu*, 927 F.2d 882, 891 (5th Cir. 1991) and *Durham Auctions, Inc.*, 585 F.3d at 242); *see also Anh Thi Kieu*, 927 F.2d at 891 ("Modern choice of law analysis, whether maritime or not, generally requires the application of the law of the state with the "most significant relationship" to the substantive issue in question.") (citing RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 6

---

[7] To be sure, the Fifth Circuit, in a variety of cases—including, but not limited to matters of admiralty, Title VII, and ERISA, as demonstrated, *infra*—has discussed, cited, or looked favorably upon the Restatement. Moreover, looking to the Restatement complies with the Supreme Court's mandate to inferior courts "to develop a federal common law of rights and obligations under ERISA-regulated plans." *Firestone*, 489 U.S. at 110–11 (1989) (citing *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 56 (1987); *Franchise Tax Board v. Construction Laborers Vacation Trust*, 463 U.S. 1, 24, n. 26 (1983)).

(1980)).  For these reasons, the Court now delineates the choice-of-law requirements of the Restatement that will guide its analysis.

The Restatement (Second) of Conflict of Laws, § 6, provides as follows:

(1) A court, subject to constitutional restrictions, will follow a statutory directive of its own state on choice of law.

(2) When there is no such directive, the factors relevant to the choice of the applicable rule of law include

(a) the needs of the interstate and international systems,

(b) the relevant policies of the forum,

(c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,

(d) the protection of justified expectations,

(e) the basic policies underlying the particular field of law,

(f) certainty, predictability and uniformity of result, and

(g) ease in the determination and application of the law to be applied.

RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 6 (1971).  Section 6 applies in all "choice of law cases except contract cases in which the parties have agreed to a valid choice of law clause."  *Mayo v. Hartford Life Ins. Co.*, 354 F.3d 400, 403 (5th Cir. 2004); *Aruba Petroleum, Inc. v. FCS Advisors, Inc.*, 2014 WL 12596586, at *9 (E.D. Tex. Feb. 4, 2014). Because no statutory directive exists in this case, the fact-based analysis of the Restatement applies.  *See* RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 6 (1971) cmt. b ("A court will rarely find that a question of choice of law is explicitly covered by statute.  That is to say, a court will rarely be directed by statute to apply the local law of one state, rather than the local law of another state, in the decision of a particular issue.").  Further,

while the Restatement does not provide a specific analytical schem[a] for determining insurable interest claims, it does address choice of law analyses for various kinds of disputes that can be analogized to this one.  These later sections demonstrate the concrete application of the "most significant relationship" test, and all incorporate § 6 as the starting

18

point for any such analysis. Of potential relevance here [is]: . . . § 188, governing contract disputes . . . .

*Mayo*, 354 F.3d at 404. "The § 188 inquiry is directed at unearthing and upholding contracting parties' intent as to the governing law." Section 188, Law Governing in Absence of Effective Choice by the Parties, provides as follows:

> (1) The rights and duties of the parties with respect to an issue in contract are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the transaction and the parties under the principles stated in § 6.

> (2) In the absence of an effective choice of law by the parties (*see* § 187), the contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include:

>> (a) the place of contracting,

>> (b) the place of negotiation of the contract,

>> (c) the place of performance,

>> (d) the location of the subject matter of the contract, and

>> (e) the domicil, residence, nationality, place of incorporation and place of business of the parties.

> These contacts are to be evaluated according to their relative importance with respect to the particular issue.

> (3) If the place of negotiating the contract and the place of performance are in the same state, the local law of this state will usually be applied, except as otherwise provided in §§ 189–199 and 203.

RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 188 (1971). Each of the choice of law factors must be evaluated "according to their relative importance with respect to the particular issue." *Mayo v. Hartford Life Ins. Co.*, 220 F. Supp. 2d 714, 751 (S.D. Tex. 2002) *aff'd*, 354 F.3d 400 (5th Cir. 2004) (citing RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 188(2)).[8]

---

[8] Restatement § 192 does not apply here because the life insurance contract was not issued to Byerly, the insured, upon his application; rather, the Group Policy applied to Byerly as a portion of his compensation package at FIS. *See Mayo*, 354 F.3d at 405 ("Finally, § 192 specifies the choice of law analysis in cases involving life insurance contracts, but only those *that have been issued to the insured upon his application.*") (emphasis in original) (citing RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 192, cmt. a (1971)).

The Court now proceeds to determining whether Texas or Florida law applies in the present action. In considering this question, the Court looks to, among other things, the Declaration of Standard Insurance Company made by Trey Shoemaker (Dkt. #38, Exhibit B)—a Declaration to which Byerly made no objection.

a.   Place of Contracting & Place of Negotiation of the Contract

The place of contracting and negotiation in this case is instructive. This case involves a contract, the Group Policy, sold in Florida, to a Florida employer, by an Oregon insurer. During the negotiation process, Standard Insurance—the Oregon insurer—enlisted workers out of Florida and Georgia to negotiate the terms of the Group Policy while FIS—the Florida employer—enlisted its employees from Florida to negotiate. A broker out of Georgia also aided in negotiations. FIS personnel, working in Florida, decided to purchase the Group Policy. Accordingly, the Group Policy and Certificate of Insurance were delivered by Standard to FIS headquarters in Jacksonville, Florida. No Texans were involved in the negotiations of the Group Policy, Byerly merely received the Group Policy as part of his compensation package with no active negotiation on his part,[9] and the final decision to accept the offered contract was made in Florida.[10] Moreover, the Group Policy that is distributed to those insured by it states that the Group Policy was issued in Florida. Thus, the first two factors—though not tipping the scales far—favor Florida as Texas is not implicated whatsoever.[11]

---

[9] If Byerly personally negotiated any terms rather than receiving a standard contract, such negotiations are absent from the record.

[10] The Court is not presented with any facts which illuminate where the final act of entering into the contract—i.e., the signing of said contract—occurred. *See* RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 188 cmt. e ("[T]he place of contracting is the place where occurred the last act necessary, under the forum's rules of offer and acceptance, to give the contract binding effect . . . ."). Without such knowledge, and given the panoply of facts supporting Florida and omitting Texas as the place of negotiation, the Court must find the first two factors favoring Florida.

[11] "Standing alone, the place of contracting is a relatively insignificant contact." RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 188 cmt. e.

b.   The Place of Performance

The place of performance of a life insurance contract is the state where premiums are made payable, even if the contract was made in another state.  *See Mayo*, 220 F. Supp. 2d at 755 (citing *New York Life Ins. Co. v. Baum*, 700 F.2d 928, 933 (5th Cir. 1983) (stating that "[p]erformance, in the case of a life insurance contract, entails both payment of premiums by the policy owner and the payment of proceeds by the insurer"); *American Nat'l Ins. Co. v. Huckleberry*, 638 F. Supp. 233, 235 (N.D. Tex. 1986).  The place of performance factor favors Florida.  The Group Policy is non-contributory.  As such, FIS—again, a citizen of Florida—paid all premiums to Standard Insurance.  Standard Insurance reciprocated this process by billing all premiums to FIS' Florida offices.  While this practice occurred, Byerly, through his wife, provided no summary judgment evidence of how he interacted with Standard Insurance.  Indeed, the scant mention of any interaction Byerly had with Standard Insurance is that he applied for AD&D benefits and that he opted to purchase additional AD&D benefits and thus personally paid additional premiums directly to Standard Insurance.  As previously mentioned in footnote 2, *supra*, however, the Court will not consider Byerly's additional premium argument absent summary judgment evidence corroborating the argument.  Not only is this additional premium argument unsupported, its novelty in a supplemental brief ordered by the Court and its contradictory nature, as it relates to past pleadings, raises serious questions as to the veracity of such statement.  Therefore, the Court will only consider that which is supported by the Administrative Record or proper summary judgment evidence.  *See Johnson*, 14 F.3d at 1060.

Turning to the Administrative Record, it is readily apparent that some portion of performance occurred in Texas—application for benefits; Florida—payment of premiums; and Oregon—provision of life insurance and AD&D benefits.  Thus, at first blush, this factor seems

neutral. A more accurate reading of this factor, however, is that the factor narrowly favors Florida given the current state of the law. *See* RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 188 cmt. e ("On the other hand, the place of performance can bear little weight in the choice of the applicable law when (1) at the time of contracting it is either uncertain or unknown, or when (2) performance by a party is to be divided more or less equally among two or more states with different local law rules on the particular issue."). FIS, the party who paid the premiums, paid the premiums in Florida and held the Group Policy; to be sure, the Group Policy states that it was issued in Florida. Meanwhile, Byerly, one of the insured, applied for the benefits associated with the payments of said premiums from Texas. While the latter fact is noted by the Court, and affects the Court's analysis, the fact that the premiums were paid in Florida to an Oregon company trumps Byerly's involvement in Texas. Thus, while one can argue that both Texas and Florida are implicated under this factor, under the law, Florida is more heavily implicated. The Court finds that this factor favors Florida over Texas.

### c. The Location of the Subject Matter of the Contract

The subject matter of a life insurance contract is the life of the insured. *See Mayo*, 220 F. Supp. 2d at 757–58; *see also Dialysis Newco, Inc. v. Comm. Health Systems Group Health Plan*, 938 F.3d 246, 252 (5th Cir. 2019) ("We may consider analogous state law as a guide when determining the applicable federal common law.") (citing *Wegner v. Standard Ins. Co.*, 129 F.3d 814, 818 (5th Cir. 1997)); RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 188 cmt. e ("The state where the . . . risk is located will have a natural interest in transactions affecting it."). This factor

favors Texas given that Byerly, whose life was the subject matter of the Group Policy, resided in, and was a citizen of, Texas.

      d.   The Domicil, Residence, Nationality, Place of incorporation and Place of Business of the Parties.

The final factor of § 188 of the Restatement favors neither Florida nor Texas.  Standard Insurance is an Oregon corporation with its principal place of business in Portland, Oregon.  FIS is a Delaware limited liability company with its principal place of business in Jacksonville, Florida.  And Byerly is a Texan.  As previously stated, Byerly was insured under the Group Policy as part of his compensation package through FIS.  Thus, while Oregon, Texas, and Florida are all implicated when considering the citizenship of all parties to the Group Policy, the fact that Byerly, a Texas resident, is the insured under a life insurance policy must be considered by the Court.  *See* RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 188 cmt. e ("As stated in § 192, the domicil of the insured is a contact of particular importance in the case of life insurance contracts.").  Recognizing the "particular importance" of the domicil of Byerly as the insured, the Court is still unpersuaded that the final factor favors Texas.  The majority of the members to this contract are not incorporated in Texas, do not list Texas as a place of business, and are not domiciled in Texas.  Moreover, the Group Policy in dispute is a policy that applies to a plethora of workers at FIS, many of whom are not Texans, as the Group Policy was issued to FIS.[12]  While it is important that Byerly is a Texan, the place of incorporation and place of business of the other parties—parties who were much more involved in the negotiation, creation, and implementation of the Group Policy—have

_____

[12] Again, without appropriate summary judgment evidence, the Court cannot consider unsupported allegations by Byerly regarding payment of premiums.  Even if the Court did consider Byerly's payment of some additional premiums, however, the Court's choice-of-law analysis would not change given the Court's consideration of the other § 188 and § 6 factors.

no connections to Texas, that the Court is aware of, other than an employee who resided there. The Court is accordingly not persuaded that this factor favors either state.

e.   Section 6 Considerations

Having considered § 188's principles, the Court now turns to § 6's principles.  Notably, the parties do not address the principles laid out in § 6 of the Restatement just as they failed to do so for § 188.[13]  Nevertheless, the Court must still consider § 6's principles.  The first principle, the needs of the interstate and international systems, favors neither Texas nor Florida.  This action was brought under ERISA; thus, although Texas and Florida may each have individual policy preferences with regards to matters of insurance, the federal scheme provided by Congress is the most important consideration for the Court.  Consequently, the first principle favors neither state.

Next, the Court must consider the relevant policies of the forum state and of other interested states.  Texas has an anti-delegation statute; Florida does not.  Texas wants to protect its citizens who enter into insurance contracts; Florida has an interest in ensuring that contracts negotiated, executed, and performed within its borders—at least, in large part—adhere to its laws.  Again, the Court finds that both states have relevant policy interests in the Group Policy.  With that being said, the Group Policy is one that was negotiated, entered into, and performed in Florida.  The only connection to Texas is that one of FIS' employees resides in Texas.  Thus, while each state has relevant policies, Florida's interest in the Group Policy, relative to Texas' interest, seems more persuasive to the Court.  *See* RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 6 cmt. f. ("In general, it is fitting that the state whose interests are most deeply affected should have its local law applied.").  If the simple existence of the Texas Insurance Code were to compel the Court to grant Texas a greater interest in each life insurance policy that one of its citizens holds—over the

_____

[13] The parties were given a second chance to provide the Court with arguments surrounding these choice-of-law principles in the supplemental briefing the Court ordered, yet the parties still failed to address the appropriate law.

interests of other relevant states—the Texas Insurance Code would effectively eviscerate any other state interest in policing contracts otherwise negotiated, signed, or performed in those respective states. Such an outcome is surely not warranted.[14] The second and third factors accordingly favor Florida. *See id.* at cmt. e. ("On the other hand, the court is under no compulsion to apply the statute or rule to such out-of-state facts since the originating legislature or court had no ascertainable intentions on the subject. The court must decide for itself whether the purposes sought to be achieved by a local statute or rule should be furthered at the expense of the other choice-of-law factors mentioned in this Subsection.").

The Court must also consider the justified expectations of the parties. This factor asks the Court to ensure that each party is treated fairly such that no party is improperly held liable for a violation of a local law that they thought would apply. *See* RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 6 cmt. g. While this factor is not directly called into question, a review of the expectations of the parties, and whether those expectations were justified, is still telling. Here, if any law is favored, it is Florida law. The Group Policy, which is distributed to those insured by the Policy, states that the Policy was issued in Florida by FIS, a Florida company. Moreover, a Florida company negotiated and entered into the contractual Group Policy in Florida and paid the premiums out of Florida for its employees. While there was no choice of law provision, FIS states, in the Shoemaker Declaration, that it "understood that Florida law would apply to the Group Policy" (Dkt. #38, Exhibit B). Although it is notable that Byerly made no objection to said Declaration, the Court is hesitant to consider an after-the-fact statement of what law Standard

---

[14] Byerly requests that the Court take judicial notice "that many (probably most) Texas insureds who are beneficiaries of employer sponsored insurance plans are insured under plans sold by out-of-state insurance companies to out-of-state employers" (Dkt. #51). Byerly avers that without considering such fact, the Court will "largely gut the [Texas Insurance Code]" (Dkt. #51). It is not proper, however, for the Court to take judicial notice of such a sweeping proposition when Byerly has not met his burden under FED. R. EVID. 201(b) nor provided any summary judgment evidence supporting said statement. The Court accordingly declines to take judicial notice of such conjecture.

Insurance *intended* to apply. This hesitance is especially fitting when Standard Insurance fails to cite how such expectation required them to mold their conduct to a particular set of laws. Consequently, while the Shoemaker Declaration may bolster Standard Insurance's case, the Court finds it imprudent to consider such evidence. Nonetheless, the Court is persuaded that it is only reasonable for the parties to have expected Florida law to apply to the Group Policy given the place of negotiation, contracting, performance, and location of each of the parties. That Byerly was a Texan at a company who employed a variety of citizens does not persuade the Court that Byerly would be justified in expecting that Texas law would apply to the Group Policy. Therefore, the Court finds that the present factor narrowly favors Florida law.

Next, the Court must consider the basic policies underlying the particular field of law. According to the Restatement:

> This factor is of particular importance in situations where the policies of the interested states are largely the same but where there are nevertheless minor differences between their relevant local law rules. In such instances, there is good reason for the court to apply the local law of that state which will best achieve the basic policy, or policies, underlying the particular field of law involved.

*See* RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 6 cmt. h. Like the policies of the forum state and interested states, the Court recognizes that the underlying field of law here is one governed, almost exclusively due to ERISA's preemption force, by federal law. With that being said, Texas has an anti-delegation statute and Florida has opted to allow delegation. While the Court does not comment on the validity or propriety of either State's policies, the Court does note that Florida's decision to permit delegation, and consequently deferential review when such discretion is afforded, is in keeping with the trust principles that encompass ERISA. *See Firestone*, 489 U.S. at 110–11 ("ERISA abounds with the language and terminology of trust law . . . . Trust principles make a deferential standard of review appropriate when a trustee exercises discretionary powers."). At the same time, the Supreme Court also permitted employers to effectively choose

the standard of review they would be subjected to; that is, until states enacted their own subsequent policies. *See id.* at 115 ("Consistent with established principles of trust law, we hold that a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan."). Thus, the Supreme Court essentially placed its stamp of approval on both form of reviews as it found that each form had some foundation in trust law. *See id.* at 112 ("The trust law *de novo* standard of review is consistent with the judicial interpretation of employee benefit plans prior to the enactment of ERISA."). In short, precedent surrounding ERISA permits the standard of review to change based upon the existence, or absence, of discretionary clauses.[15] Because the Court finds that both policies are in keeping with basic trust principles, the Court concludes that this factor favors neither State's laws over the others.

The Court must also consider the certainty, predictability and uniformity of result. This factor requires the Court to seek to develop "good rules" while discouraging forum shopping. *See* RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 6 cmt. i. This factor seems to favor neither state. Both states are inherently interested in the predictability and uniformity of the laws of their respective states. Without briefing on why this factor should favor either state, or how forum shopping might be encouraged by the Court's decision, the Court finds that this factor does not tilt the proverbial scales in either direction.

Finally, the Court must consider the ease in the determination and application of the law to be applied. According to the Restatement, "[t]his policy should not be overemphasized." *See id.* at cmt. j. The Court finds that this factor is unpersuasive given the weight of the other factors.

---

[15] The Court is in no way commenting on whether an anti-delegation statute would be preempted by ERISA, an open question in the Fifth Circuit, at this juncture.

Having considered the principles of the Restatement, the Court finds that the balance of these factors requires the application of Florida law to the Group Policy in this case. The Group Policy here was issued to a Florida company, FIS, after negotiations occurred between FIS and Standard Insurance, an Oregon company. The decision to enter into the contract was made in Florida. Moreover, the Group Policy states that it was issued in Florida, all premiums were paid in Florida—again, Byerly has provided no summary judgment evidence to the contrary—and all bills were sent to FIS in Florida. The fact that one employee, Byerly, lived in Texas, applied for benefits from Texas, and now claims that Texas law should apply to the Group Policy is unconvincing. To be sure, it is unreasonable for Byerly to argue that he had any justified expectation that Texas law would govern the Group Policy under which he was insured. Rather, given the aforementioned facts, it is reasonable for the parties to have expected Florida law to apply to the Group Policy. Having considered § 188 and § 6 of the Restatement, the Court concludes that Florida law governs this action. Consequently, the Court considers Florida law as it turns to the Administrative Record.

II.     Byerly is Not Entitled to Benefits Pursuant to § 1132(a)(1)(B)

Now that the Court has determined that Florida law governs this dispute, and that there is consequently no anti-delegation statute at play, a second issue arises: which Circuit's law applies the standard of review for Standard Insurance's denial of benefits. Standard Insurance avers that because Florida law governs this action, Eleventh Circuit law provides the standard of review for the denial of AD&D benefits. Byerly does not contest this assertion. Indeed, neither party urges the application of the Fifth Circuit's standard of review should Florida law govern. Moreover, neither party provides the Court with any briefing on this issue; rather, Standard Insurance simply argues that Eleventh Circuit precedent governs absent any legal authority. The Court cannot

merely take Standard Insurance's word that Eleventh Circuit law governs this dispute. If Eleventh Circuit law applies, the Court will have to conduct a *de novo* review at the outset. *See Blankenship v. Metro. Life Ins. Co.*, 644 F.3d 1350, 1355 (11th Cir. 2011). Only after conducting such *de novo* review will the Court *potentially* consider the presence of the delegation clause leading to an arbitrary and capricious review. *See id.* On the contrary, if Fifth Circuit law applies the Court, recognizing the validity of the delegation clause given the lack of an anti-delegation statute, will review the Administrative Record for abuse of discretion. *See McCorkle v. Metropolitan Life Ins. Co.*, 757 F.3d 452, 457 (5th Cir. 2014). *De novo* review would be unnecessary should Fifth Circuit precedent govern. The parties have provided the Court with no guidance as to why the Eleventh Circuit's standard of review for the denial of insurance benefits should be applied by a district court sitting in the Fifth Circuit.

After an independent review, the Court finds that no court has addressed this federal question choice of law issue. Indeed, the Court only found such issue remotely addressed in cases surrounding patent infringement causes of action and cases discussing what law applies post-transfer.[16] Put simply, this question, to the Court's knowledge, has not been addressed.[17] With that being said, the Court need not answer this question. Irrespective of which Circuit's standard of review applies, the Court comes to the same conclusion: Byerly is not entitled to AD&D benefits pursuant to § 1132(a)(1)(B). Thus, the Court will consider each standard below.

The Court turns now to the cross-motions for summary judgment before it. "When both parties move for summary judgment, the court must evaluate each motion on its own merits,

---

[16] *Zero Down Supply Chain Solutions, Inc. v. Global Transp. Solutions, Inc.*, 2012 WL 5194230, at *1 (D. Utah Oct. 19, 2012) (citing *Olcott v. Del. Food Co.*, 76 F.3d 1538, 1544–45 (10th Cir. 1996) (stating, when discussing the law surrounding a change of venue, that "where jurisdiction is based on a federal question, a federal district court is obligated to apply the law of the circuit in which it sits, unless the issue is one of 'geographically non-uniform' federal law.").

[17] Furthermore, the Court, after conducting its own research, is unaware of any authority that addresses whether the standard of review in an ERISA case is a procedural or substantive matter.

resolving all reasonable inferences against the party whose motion is under consideration." *Price v. Dunn*, 385 F. Supp. 3d 1215, 1225 (S.D. Ala. 2019) (citing *Muzzy Prods., Corp. v. Sullivan Indus., Inc.*, 194 F. Supp. 2d 1360, 1378 (N.D. Ga. 2002)); *see also Shaw Constructors v. ICF Kaiser Engineers, Inc.*, 395 F.3d 533, 538–39 (5th Cir. 2004) ("Cross-motions must be considered separately, as each movant bears the burden of establishing that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law.").

Here, the parties do not disagree on the material facts; rather, they disagree on what caused Byerly's BKA. In other words, neither party disputes that Byerly injured his toe or that he has an extensive history of medical ailments; rather, they simply disagree on which of those two options caused the BKA. Because the parties do not dispute any of the facts contained in the Administrative Record and both rely on said Administrative Record as their summary judgment evidence, the only issue presented to the Court is one of contract interpretation. Specifically, the only question the Court must decide is whether Standard Insurance properly denied coverage for Byerly's below-the-knee amputation after concluding that the Loss was "not caused solely and directly by an accident independently of other causes." The Court concludes that Standard Insurance did not err in denying Byerly AD&D benefits.[18]

---

[18] Pursuant to § 1132(a)(1)(B), a "participant or beneficiary" may bring a civil action "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan . . . ." 29 U.S.C. § 1132(a)(1)(B). "A plaintiff suing under this provision bears the burden of proving his entitlement to contractual benefits." *Horton v. Reliance Standard Life Ins. Co.*, 141 F.3d 1038, 1040 (11th Cir. 1998) (citing *Farley v. Benefit Trust Life Ins. Co.*, 979 F.2d 653, 658 (8th Cir. 1992)). "But, if the insurer claims that a specific policy exclusion applies to deny the insured benefits, the insurer generally must prove the exclusion prevents coverage." *Id.* (citing *Farley*, 979 F.2d at 658). This same standard applies in the Fifth Circuit. *See Perdue v. Burger King Corp.*, 7 F. 3d 1251, 1254 n.9 (5th Cir. 1993); *Estate of Thompson v. Sun Life Assur. Co. of Canada*, 603 F. Supp. 2d 898, 908–09 (N.D. Tex. 2008) ("[A]s a matter of general insurance law, the insured has the burden of proving that a benefit is covered, while the insurer has the burden of proving that an exclusion applies.") (citing *Critchlow v. First UNUM Life Ins. Co. of Am.*, 378 F.3d 246, 256 (2d Cir. 2004)).

A. Eleventh Circuit

Because the parties address Eleventh Circuit law in their respective briefs, the Court first looks to the Eleventh Circuit's standard of review.

i. Standard of Review Under ERISA

ERISA requires a district court to review determinations made by employee benefit plans, including employee disability plans. *See* 29 U.S.C. § 1132(a)(1)(B); *Firestone*, 489 U.S. at 109. In reviewing an ERISA benefits denial case, "the district court sits more as an appellate tribunal than as a trial court." *Curran v. Kemper Nat. Servs., Inc.*, 2005 WL 894840, at *7 (11th Cir. Mar. 16, 2005) (quoting *Leahy v. Raytheon Co.*, 315 F.3d 11, 17–18 (1st Cir. 2002)). To be sure, the district court "does not take evidence, but, rather, evaluates the reasonableness of an administrative determination in light of the record compiled before the plan fiduciary." *Id.* Consequently, "there 'may indeed be unresolved factual issues evident in the administrative record, but unless the administrator's decision was wrong, or arbitrary and capricious, these issues will not preclude summary judgment as they normally would.'" *Miller v. PNC Fin. Serv. Grp., Inc.*, 278 F. Supp. 3d 1333, 1341 (S.D. Fla. 2017) (quoting *Pinto v. Aetna Life Ins. Co.*, 2011 WL 536443, at *8 (M.D. Fla. Feb. 15, 2011)).

Section 1132(a)(1)(B) does not set out a standard of review for actions challenging benefit eligibility determinations. *See Firestone*, 489 U.S. at 109. Nonetheless, the Supreme Court has stated that, under § 1132(a)(1)(B), a court must review the denial of ERISA benefits "under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Id.* at 115. The Eleventh Circuit has developed a multi-step framework for analyzing an administrator's benefits determination:

(1) Apply the de novo standard to determine whether the claim administrator's benefits-denial decision is "wrong" (i.e., the court disagrees with the administrator's decision); if it is not, then end the inquiry and affirm the decision.

(2) If the administrator's decision in fact is "de novo wrong," then determine whether [the administrator] was vested with discretion in reviewing claims; if not, end judicial inquiry and reverse the decision.

(3) If the administrator's decision is "de novo wrong" and he was vested with discretion in reviewing claims, then determine whether "reasonable" grounds supported it (hence, review his decision under the more deferential arbitrary and capricious standard).

(4) If no reasonable grounds exist, then end the inquiry and reverse the administrator's decision; if reasonable grounds do exist, then determine if he operated under a conflict of interest.

(5) If there is no conflict, then end the inquiry and affirm the decision.

(6) If there is a conflict, the conflict should merely be a factor for the court to take into account when determining whether an administrator's decision was arbitrary and capricious.[19]

*Blankenship*, 644 F.3d at 1355.

### ii. Byerly is Not Entitled to AD&D Benefits Under the Group Policy

As *Blankenship* mandates, the Court must first apply a *de novo* standard of review to the Administrative Record to determine whether the Court disagrees with Standard Insurance's decision. *Id.* To adequately review the Administrative Record, the Court must look not only to the various medical records that accompany it, but also to the Group Policy. Thus, before the Court conducts a *de novo* review of the Administrative Record, the Court finds it proper to lay out the contents of the Group Policy. *See Harris v. Lincoln Nat'l Life Ins. Co.*, 365 F. Supp. 3d 1208, 1224 (N.D. Ala. 2019) (citing *Ruple v. Hartford Life and Acc. In. Co.*, 340 F. App'x. 604, 611 (11th Cir. 2009) ("The Eleventh Circuit explained, albeit in an unpublished decision, that a court conducting the *de novo* review 'applies the terms of the policy.'"); *see also Hillyer v. Hartford Life and Acc. Ins. Co.*, 2011 WL 925027, at *13 (N.D. Ala. Jan. 31, 2011) (quoting 29 U.S.C. § 1104(a)(1)) ("[T]his court begins with a review of the Policy itself, since an ERISA plan

---

[19] "In ERISA cases, the phrases "arbitrary and capricious" and 'abuse of discretion' are used interchangeably." *Miller*, 278 F. Supp. 3d at 1342 n.9 (citing *Jett v. Blue Cross & Blue Shield of Ala., Inc.*, 890 F.2d 1137, 1139 (11th Cir. 1989)).

administrator must discharge its duties 'in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of [ERISA].'").  The relevant portions of said Group Policy are as follows:

ACCIDENTAL DEATH AND DISMEMBERMENT INSURANCE

A.  Insuring Clause

If you have an accident, including accidental exposure to adverse conditions, while insured for AD&D Insurance, and the accident results in a Loss, we will pay benefits according to the terms of the Group Policy after we receive Proof Of Loss satisfactory to us.

B.  Definition of Loss for AD&D Insurance

Loss means loss of life, hand, foot, sight, speech, coma, hearing in both ears, thumb and index finger of the same hand and Quadriplegia, Hemiplegia or Paraplegia which meets all of the following requirements:

1. Is caused solely and directly by an accident.

2. Occurs independently of all other causes.

3. With respect to Loss of life, is evidenced by a certified copy of the death certificate.

4. With respect to all other Losses, occurs within 365 days after the accident and is certified by a Physician in the appropriate specialty as determined by us.

With respect to a hand or foot, Loss means actual and permanent severance from the body at or above the wrist or ankle joint, whether or not surgically reattached.

E.  AD&D Insurance Exclusions

No AD&D Insurance benefit is payable if the accident or Loss is caused or contributed to by any of the following:

5. Sickness or Pregnancy existing at the time of the accident.

8. Medical or surgical treatment for any of the above.

## ALLOCATION OF AUTHORITY

Except for those functions which the Group Policy specifically reserves to the Policyholder, we have full and exclusive authority to control and manage the Group Policy, to administer claims, and to interpret the Group Policy and resolve all questions arising in the administration, interpretation, and application of the Group Policy.

Our authority includes, but is not limited to:

1. The right to resolve all matters when a review has been requested;

2. The right to establish and enforce rules and procedures for the administration of the Group Policy and any claim under it;

3. The right to determine:

   a. Eligibility for insurance;

   b. Entitlement to benefits;

   c. Amount of benefits payable;

   d. Sufficiency and the amount of information we may reasonably require to determine a., b., or c., above.

Subject to the review procedures of the Group Policy any decision we make in the exercise of our authority is conclusive and binding.

## DEFINITIONS

Sickness means your sickness, illness, or disease.

(Dkt. #38, Exhibit 1 at pp. 44, 45, 59, 63).

With the relevant portions of the Group Policy in mind, the Court turns to a *de novo* review of the Administrative Record.

a. *De Novo* Review

Under the initial *de novo* review step of an ERISA analysis, the Court must determine whether an Administrator/Insurer's decision to deny benefits was wrong. *See Glazer v. Reliance Standard Life Ins. Co.*, 524 F.3d 1241, 1246 (11th Cir. 2008). "A decision is 'wrong' if, after a review of the decision of the administrator from a de *novo* perspective, 'the court disagrees with the administrator's decision.'" *Id.* at 1246 (citation omitted). Put simply, the Court must "stand in the shoes of the administrator and start from scratch, examining all the evidence before the administrator as if the issue had not been decided previously." *Stilz v. Metro. Life Ins. Co.*, 2006 WL 2534406, at *6 (N.D. Ga. Aug. 30, 2006). "[W]here the court determines whether the administrator was wrong under a '*de novo*' standard," a district court is limited to the "record that was before [the administrator] when it made its decision." *Gipson v. Admin. Comm. of Delta Air Lines, Inc.*, 350 F. App'x. 389, 394 (11th Cir. 2009).

The issue presented to the Court is one of causation: namely, what caused Byerly's BKA. The Court, reviewing the Administrative Record "from scratch," must independently determine what that cause was. The Group Policy is instructive here. Per the Group Policy, a covered "Loss" occurs when there is a "loss of life, hand, foot, sight, speech, coma, hearing in both ears, thumb and index finger of the same hand and Quadriplegia, Hemiplegia or Paraplegia which meets all of the following requirements: (1) Is caused solely and directly by an accident; and (2) Occurs independently of all other causes . . . ." (Dkt. #38, Exhibit 1 at p. 4). The AD&D Insurance Exclusions under the Group Policy make this direct and independent causation requirement even more explicit by excluding any Loss "caused or contributed to by . . .: (5) Sickness or Pregnancy existing at the time of the accident . . .; or (8) Medical or surgical treatment for any of the above." (Dkt. #38, Exhibit 1 at p. 45). As evidenced by the Group Policy, coverage is limited to Losses

which are caused solely and directly by an accident independent of any other possible causes. The Eleventh Circuit has instructed courts on how to assess causation in policies with similar "direct" and "independent" causation requirements.

In *Dixon v. Life Ins. Co of North America*, 389 F.3d 1179, 1183–84 (11th Cir. 2004), the Eleventh Circuit was presented with a question of first impression for the Circuit: "whether, and to what extent, language in an ERISA policy may preclude recovery for accidental injury where some preexisting condition was a contributing factor . . . ." After reviewing conflicting precedent across the Fourth, Sixth, Ninth, and Tenth Circuits, the Eleventh Circuit chose to forgo the "strict" causation test of the Sixth and Tenth Circuits;[20] instead, the Eleventh Circuit adopted the "middle ground" test of the Fourth and Ninth Circuits. *Id.* at 1183–84. Specifically, the Eleventh Circuit turned to *Adkins v. Reliance Standards Life Ins. Co.*, 917 F.2d 794 (4th Cir. 1990). In *Adkins*, the Fourth Circuit held that "a pre-existing infirmity or disease is not to be considered as a cause unless it "substantially contributed" to the disability or loss." *Id.* at 797 (emphasis added) (citation omitted); *see also Quesinberry v. Life Ins. Co. of N. Am.*, 987 F.2d 1017, 1028 (4th Cir. 1993) (holding that, in applying the *Adkins* rule, courts should adopt a two-pronged test: "first, whether there is a pre-existing disease, pre-disposition, or susceptibility to injury; and, second, whether this pre-existing condition, pre-disposition, or susceptibility substantially contributed to the disability

---

[20] An example of the Tenth Circuit's "strict" causation test is found in *Pirkheim v. First Unum Life Ins.,* 229 F.3d 1008, 1010 (10th Cir. 2000). There, the Tenth Circuit stated:

> We hold the words "directly and independently of all other causes," given their plain and ordinary meaning in context of this particular insuring clause, are not ambiguous. In stating the "loss must result directly and independently of all other causes from accidental bodily injury," the policy imposes two obvious conditions. First, the loss must result *directly* from accidental bodily injury. Second, the loss must result *independently* of all other causes. In short, we agree with the district court the word "directly" modifies the phrase "from accidental bodily injury." Any other interpretation in this context is contrived.

*Id.* at 1010–11 (emphasis in original).

or loss.").[21]  Moreover, in *Quesinberry*, the Fourth Circuit, adopting language from *Colonial Life & Accident Ins. Co. v. Weartz*, 636 S.W.2d 891 (Ky. Ct. App. 1982), *rev'd on other grounds*, 170 S.W.3d 387 (Ky. 2005), stated that a "'pre-disposition' or 'susceptibility' to injury, whether it results from congenital weakness or from previous illness or injury, does not necessarily amount to a substantial contributing cause.  A mere 'relationship' of undetermined degree is not enough." 987 F.2d at 1028.  By adopting *Adkins*, and its progeny, as the federal common law of the Eleventh Circuit, the Eleventh Circuit stated that it was preventing insurance policies from amounting to meaningless contracts which only covered insureds, or their beneficiaries, when they happened to be in "perfect health at the time of an accident."  *Dixon*, 389 F.3d at 1184.

The question, then, given *Dixon*, is whether Byerly's preexisting medical conditions substantially contributed to his Loss.  The facts necessary for the Court's *de novo* review, as the Administrative Record establishes, are such.  On December 28, 2016, Byerly injured his left toe when he stubbed it on a piece of furniture in his home.  Byerly was 67 at the time with an extensive history of type 1 diabetes mellitus, peripheral neuropathy, peripheral arterial disease, moderate to severe distal polyneuropathy in his lower extremities, and poor renal function necessitating dialysis.  On December 31, 2016, Byerly visited Dr. Fullington who diagnosed Byerly with a toe wound with secondary cellulitis and uncontrolled Type 1 diabetes mellitus with peripheral neuropathy.  Dr. Fullington noted that there did not appear to be a deeper infection of the wound.  Subsequently, Byerly underwent an MRI which revealed second digit distal soft tissue loss with

---

[21] Similarly, the Ninth Circuit has adopted the middle ground "substantially contributed" test.  Unlike the Fourth Circuit, however, the Ninth Circuit limits the use of such test to cases where the restrictive language of the policy is conspicuous.  *See McClure v. Life Ins. Co. of N. Am.*, 84 F.3d 1129, 1136 (9th Cir.1996) ("[W]e hold that if the exclusionary language here in question is conspicuous it would bar recovery if a preexisting condition substantially contributed to the disability.  This could result in a denial of recovery even though the claimed injury was the predominant or proximate cause of the disability.").  The Eleventh Circuit adopted the Fourth Circuit version of the "substantially contributed" test and thus rejected the Ninth Circuit's requirement that the restrictive language be conspicuous.  *See Dixon*, 389 F.3d at 1184 ("We are persuaded by the reasoning of the Fourth Circuit.").

adjacent osteomyelitis of the distal phalanx and early osteomyelitis of the middle phalanx.  On March 7, 2017, Byerly visited Dr. Miller who diagnosed Byerly with gangrene and excised Byerly's toe.  Although Byerly was progressing as expected as of March 15, 2017, Dr. Miller noted that by March 28, 2017, Byerly's toe was slowing in its improvement.  Moreover, Dr. Miller diagnosed Byerly with a diabetic ulcer of foot associated with diabetes mellitus due to underlying condition, with necrosis of bone.  Due to this diagnosis, Byerly underwent a second MRI which revealed a large, irregular abscess containing gas centered around the second metatarsal extending proximally.  The MRI also gave the impression of extensive osteomyelitis of the second and third metatarsal and third proximal phalanx.  On April 3, 2017, it was discovered that the infection spread from Byerly's toe to his leg.  Consequently, Dr. Pompeo was forced to perform a left-leg BKA.  Dr. Pompeo, in recording what occurred, noted that Byerly was suffering from "a nonhealing left heel decubitus related to his neuropathy and peripheral arterial disease." (Dkt. #38, Exhibit 1 at p. 188).

What is clear from this record is that Byerly's stubbing his toe was at least partially a cause of his BKA.  Further, it is clear, per *Adkins*, that Byerly had a variety of pre-existing diseases and conditions: i.e., of type 1 diabetes mellitus, peripheral neuropathy, peripheral arterial disease, moderate to severe distal polyneuropathy in his lower extremities, and poor renal function.  *See Quesinberry*, 987 F.2d at 1028 (discussing *Adkins*).  The crux of this dispute, then, is whether Byerly's pre-existing diseases and conditions substantially contributed to his Loss.  The Court, in reviewing the Administrative Record "from scratch," finds that Byerly's pre-existing diseases and conditions substantially contributed to his Loss.  *See Stilz*, 2006 WL 2534406, at *6.

To reach this conclusion, the Court first looks to Drs. Das, Bergstrom, and Fancher's opinions.

*Dr. Das' Opinion*

Dr. Das stated, in relevant part, that Byerly had a "significant history of coronary artery disease, chronic kidney disease, and type 1 diabetes mellitus." (Dkt. #38, Exhibit 1 at p. 833). Byerly, according to Dr. Das, stubbed his toe which led to necrosis of the toe and eventual osteomyelitis requiring a BKA despite "multiple vascular procedures." (Dkt. #38, Exhibit 1 at p. 833).

*Dr. Bergstrom's Opinion*

Dr. Bergstrom, after reviewing the Administrative Record, concluded that while a stubbed toe was the initial injury leading Byerly to seek medical attention, "the development of infection and gangrene was related to his current medical conditions (diabetes, peripheral neuropathy, and PAD), and likely would not have occurred in the absence of those conditions." (Dkt. #38, Exhibit 1 at p. 163). In conclusion, Dr. Bergstrom opined that "Byerly's amputation was not directly caused by an accident and was related to diabetes, peripheral neuropathy, and PAD which produced nonhealing decubitus heel ulcers." (Dkt. #38, Exhibit 1 at p. 163).

*Dr. Fancher's Opinion*

Dr. Fancher also conducted a review of the Administrative Record. He concluded that Byerly did "not require an amputation due to trauma alone." (Dkt. #38, Exhibit 1 at pp. 117–18). Rather, Dr. Fancher found that Byerly's BKA could only have "could have only happen[ed] if he had severe underlying vascular disease." (Dkt. #38, Exhibit 1 at pp. 117–18). Thus, Dr. Fancher stated that, in his opinion, Byerly's "nonhealing ulcer, with gangrene, and his need for amputation was directly related to his diabetes and to his severe peripheral vascular disease." (Dkt. #38, Exhibit 1 at pp. 117–18).

These opinions reveal that while there may have been a variety of causes necessitating the BKA, Byerly's preexisting history of diabetes, peripheral neuropathy, and peripheral arterial disease substantially contributed to his BKA. To be sure, each of these opinions direct the Court's attention to more than a stubbed toe; indeed, they paint a picture of a complex medical case. And the complexity of that medical case is the result of an extensive medical history. As Dr. Fancher concluded, Byerly's significant history of vascular abnormalities, as a result of his "longstanding history of type 1 diabetes," made it such that it was unlikely that antibiotics could adequately treat his infected wound given his "greatly diminished blood perfusion." (Dkt. #38, Exhibit 1). Dr. Das, Byerly's own expert, even cited Byerly's significant medical history and noted that Byerly underwent "multiple vascular procedures" to try and prevent, or at least minimize, any form of excision or amputation.

While there may be various nuances in the opinions of the doctors who interacted with, diagnosed, or treated Byerly, as well as the doctors who reviewed the Administrative Record, it is readily apparent that, the Administrative Record, on the whole, supports a finding that the BKA would not have been necessary had Byerly not had these underlying conditions. Indeed, Drs. Fullington, Miller, and Pompeo also pointed to more than a simple infection in Byerly's toe; rather, they each cited either Byerly's underlying diagnosis of diabetes or peripheral arterial disease when treating Byerly. (Dkt. #38, Exhibit 1). For instance, each of those three doctors diagnosed Byerly as follows.

*Dr. Fullington*

Dr. Fullington diagnosed Byerly with a toe wound with secondary cellulitis and uncontrolled Type 1 diabetes mellitus with peripheral neuropathy.

*Dr. Miller*

Dr. Miller diagnosed Byerly with a diabetic ulcer of foot associated with diabetes mellitus due to underlying condition, with necrosis of bone.

*Dr. Pompeo*

Dr. Pompeo documented that Byerly "was recently admitted with a nonhealing left heel decubitus related to his neuropathy and peripheral arterial disease."

(Dkt. #38, Exhibit 1).

In short, the Administrative Record supports the conclusion that Byerly's preexisting diseases and conditions "substantially contributed" to his Loss. *See Dixon*, 389 F.3d at 1183–84. To find otherwise would blink reality. Moreover, Byerly, through his wife, has not provided any reason for the Court to ignore or discount these opinions. As a result, the Court concludes that Standard Insurance's decision to deny Byerly's Claim is not "wrong." *See Blankenship*, 644 F.3d at 1355.

b.   Arbitrary & Capricious Review

Even if the Court had found that Standard Insurance was wrong to deny Byerly the AD&D benefits he sought, the Court would still conclude that there were "reasonable" grounds to support Standard Insurance's decision such that it was not arbitrary and capricious. *See Blankenship*, 644 F.3d at 1355. First, Standard Insurance was vested with discretion when reviewing claims before it. *Id.* To be sure, the "Allocation of Authority" subsection of the Group Policy stated, in relevant part, that Standard Insurance has "full and exclusive authority to control and manage the Group Policy, to administer claims, and to interpret the Group Policy and resolve all questions arising in the administration, interpretation, and application of the Group Policy." (Dkt. #38, Exhibit 1 at p.

59). This language adequately vests Standard Insurance with the necessary discretion for the Court to consider the third prong of the *Blankenship* test.

Standard Insurance reasonably concluded, in reviewing and administering the Group Policy, that Byerly was excluded from coverage. Pursuant to the AD&D Insurance Exclusion Clause, "sickness" is an explicit exception to coverage. Sickness is defined as including any sickness, illness, or disease under the Definition subsection. Based upon the Administrative Record, as discussed in Part II(b)(i), *supra*, it was not unreasonable for Standard Insurance to conclude that: (1) Byerly suffered from type 1 diabetes mellitus, peripheral neuropathy, peripheral arterial disease, moderate to severe distal polyneuropathy in his lower extremities, and poor renal function at the time of his Loss; (2) those various ailments triggered the sickness exclusion; (3) said sickness substantially contributed to his Loss; and (4) the exclusion provision therefore prevented coverage of Byerly's Loss. *See Blankenship*, 644 F.3d at 1355; *see also Horton*, 141 F.3d at 1040 ("But, if the insurer claims that a specific policy exclusion applies to deny the insured benefits, the insurer generally must prove the exclusion prevents coverage."). The Court accordingly holds that Standard Insurance did not err in denying Byerly AD&D benefits.

## B. Fifth Circuit

The Court now considers the Fifth Circuit's standard of review.[22] The Court finds that the Fifth Circuit's standard also supports denying Byerly's request for AD&D benefits.

---

[22] Again, it is noteworthy that neither party urged the application of the Fifth Circuit's standard of review should Florida law govern the delegation clause issue. Which Circuit's law applies is a crucial question given that neither Circuit must recognize the precedent of the other Circuit. *See e.g.*, *Flores-Abarca v. Barr*, 937 F.3d 473, 484 (5th Cir. 2019). Nonetheless, the Court need not address this open question as each Circuit's standard supports the Court's conclusion.

### i. Standard of Review Under ERISA

A district court reviewing the denial of benefits under ERISA is to apply "a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Blake v. Metro. Life. Ins. Co.*, 772 F. Supp. 2d 834, 842 (E.D. Tex. 2010) (citing *Firestone*, 489 U.S. at 115). If a plan document expressly confers on the plan administrator the authority to determine benefits and construe the plan terms, however, that is sufficient to invoke an abuse of discretion standard of review. *See Firestone*, 489 U.S. at 115; *McCorkle v. Metropolitan Life Ins. Co.*, 757 F.3d 452, 457 (5th Cir. 2014). "A plan administrator abuses its discretion where the decision is not based on evidence, even if disputable, that clearly supports the basis for its denial." *McCorkle*, 757 F.3d at 457 (quoting *Holland v. Int'l Paper Co. Retirement Plan*, 576 F.3d 240, 246 (5th Cir. 2009) (internal quotation marks and citations omitted)). "If the plan fiduciary's decision is supported by substantial evidence and is not arbitrary or capricious, it must prevail." *Schexnayder v. Hartford Life & Acc. Ins. Co.*, 600 F.3d 465, 468 (5th Cir. 2010) (quoting *Ellis v. Liberty Life Assurance Co. of Boston*, 394 F.3d 262, 273 (5th Cir. 2004)). The plan administrator's decision is arbitrary "'only if made without a rational connection between the known facts and the decision or between the found facts and the evidence.'" *Holland*, 756 F.3d at 246–247 (quoting *Meditrust Fin. Servs. Corp. v. Sterling Chems., Inc.*, 168 F.3d 211, 215 (5th Cir. 1999)). Under the abuse of discretion standard, a court's "review of the administrator's decision need not be particularly complex or technical; it need only assure that the administrator's decision fall somewhere on a continuum of reasonableness-even if on the low end." *Holland*, 576 F.3d at 247 (quoting *Corry v. Liberty Life Assurance Co. of Boston*, 499 F.3d 389, 39 (5th Cir. 2007)).

ii. Byerly is Not Entitled to AD&D Benefits Under the Group Policy

Under Fifth Circuit precedent, like Eleventh Circuit precedent, Byerly is not entitled to AD&D benefits because Standard Insurance did not abuse its discretion in denying said benefits. As previously discussed, Standard Insurance's Allocation of Authority subsection vested Standard Insurance with the necessary discretion for an abuse of discretion review. *See Blake*, 772 F. Supp. 2d at 842. Further, it is readily apparent that Standard Insurance's determination was supported by substantial evidence. Even if the "substantial contribution" test of the Eleventh Circuit does not apply in the Fifth Circuit, it cannot be reasonably argued that Standard Insurance did not have a panoply of evidence that supported its conclusion that Byerly's BKA could not be covered due to the Sickness exclusion. *See McCorkle*, 757 F.3d at 457. As previously discussed, the doctors who interacted with, diagnosed, or treated Byerly, as well as the doctors who reviewed the Administrative Record, all pointed to Byerly's extensive medical history as a cause of, or at least a major factor leading to, his BKA. Surely Standard Insurance's decision does not lack the "rational connection" necessary when predicated upon such medical testimony. *See Holland*, 756 F.3d at 246–247. Consequently, the Court finds that, even under the Fifth Circuit's standard of review, Byerly is not entitled to AD&D benefits.

III. Byerly is Not Entitled to Pre-Judgment Interest or Disgorgement of Profits Pursuant to § 1132(a)(3)

In addition to Byerly's request for AD&D benefits pursuant to § 1132(a)(1)(B), the Court is also presented with a request for pre-judgment interest or disgorgement of profits earned pursuant to § 1132(a)(3). Standard Insurance avers that because Byerly has a viable claim under § 1132(a)(1)(B) he is precluded from asserting a claim under § 1132(a)(3). Byerly has not responded to this argument.

Byerly may not proceed under both § 1132(a)(1)(B) and § 1132(a)(3).  To be sure, in *Katz v. Comprehensive Plan of Group Ins.*, 197 F.3d 1084 (11th Cir. 1999), the Eleventh Circuit affirmed a district court's holding that "an ERISA plaintiff with an adequate remedy under § 1132(a)(1)(B)[] cannot alternatively plead and proceed under § 1132(a)(3).  Similarly, in *Tolson v. Avondale Industries, Inc.*, 141 F.3d 604 (5th Cir. 1998) (citing *Tolson v. Avondale Indus., Inc.*, 1997 WL 539919, at *7 (E.D. La. Aug. 29, 1997)), the Fifth Circuit affirmed a district court's holding that "personal recovery by beneficiaries under § 1132(a)(3) is generally not proper when the basis of the claim is simply the denial of benefits under the terms of a policy."  Both of these holdings were in keeping with, and, indeed, predicated upon, *Varity Corp. v. Howe*, 516 U.S. 489, 515 (1996) which held that "where Congress elsewhere provided adequate relief for a beneficiary's injury, there will likely be no need for further equitable relief, in which case such relief normally would not be 'appropriate.'"  Because Byerly has a viable claim under § 1132(a)(1)(B), the Court concludes that he may not proceed under § 1132(a)(3).  *Id.*

Moreover, even if it were permissible to bring a § 1132(a)(3) claim in conjunction with a § 1132(a)(1)(B) claim, Byerly failed to show that he is entitled to benefits; therefore, he cannot be entitled to a disgorgement of benefits that were never rightfully his.  Byerly's is consequently not entitled to pre-judgment interest or disgorgement of profits under § 1132(a)(3).  Byerly's Motion for Summary Judgment, as to each causes of action, is therefore denied while Defendant's Motion for Summary Judgment is granted.

## CONCLUSION

It is therefore **ORDERED** that Plaintiff's Motion for Partial Summary Judgment with Supporting Memorandum (Dkt. #37) is hereby **DENIED**.

It is further **ORDERED** that Defendant's Motion for Summary Judgment or, Alternatively, for Judgment under Rule 52 (Dkt. #38) is hereby **GRANTED**.

**SIGNED this 25th day of March, 2020.**

AMOS L. MAZZANT
UNITED STATES DISTRICT JUDGE